UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DONNA MAHONEY, | § | |
|     *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| LIFE INSURANCE COMPANY OF | § | |
| NORTH AMERICA, CIGNA, CIGNA | § | |
| GROUP INSURANCE, THE GROUP LIFE | § | |
| AND HEALTH BENEFITS PLAN FOR | § | |
| EMPLOYEES OF PARTICIPATING AMR | § | |
| CORPORATION SUBSIDIARIES, | § | |
| and AMERICAN AIRLINES, INC. | § | |
|     *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Donna Mahoney files this Original Complaint against Defendants Life Insurance Company of North America, Cigna, Cigna Group Insurance, The Group Life and Health Benefits Plan for Employees of Participating AMR Corporation Subsidiaries, and American Airlines, Inc., and would show as follows:

### I.
### Introduction

1.    This action is brought to secure recovery of a death benefit payable under the terms of a group accidental death policy issued to the Plaintiff Donna Mahoney for her husband, Richard Mahoney (deceased), through Donna's employer.

2.    Richard died on or about July 14, 2015 and was covered by the insurance policy. Plaintiff brings this claim to recover the benefit payable, plus associated and further relief as the Court may deem just under the circumstances.

**II.**

**Jurisdiction and Venue**

3.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*

4.      Plaintiff's claims "relate to" an "employee welfare benefit plan" as defined by ERISA, 29 U.S.C.A. §§ 1001 *et seq.* and the subject plan constitutes a "plan under ERISA" (hereinafter referred to as "the Plan").

5.      This Court's jurisdiction is invoked pursuant to 28 U.S.C.A. § 1331 and 29 U.S.C. §1132(a)(1)(B) and (e)(1).

6.      Venue is proper before this Court under 29 U.S.C. §1132(e)(2) as this federal district is where the plan is administered, where the breach took place, and where the defendants reside or may be found.

7.      Plaintiff has exhausted all administrative remedies under the terms of the policy and any plan pursuant to which it was issued.

**III.**

**Parties**

8.      Plaintiff is an individual and a citizen of Texas.

9.      Defendant **Life Insurance Company of North America** may be served through its agent for service of process in Texas, CT Corporation System, 350 North St. Paul, Dallas, Texas 75201.

10.     Defendant **Cigna**[1] may be served service of process by serving CT Corporation System, 350 North St. Paul, Dallas, Texas 75201.

---

[1] Pursuant to the provisions of Rule 28 of the Texas Rules of Civil Procedure and other applicable law, Plaintiff specifically invokes her right to institute suit against whatever entity was conducting business using the assumed or common name of

11.     Defendant **Cigna Group Insurance**[2] may be served service of process by serving CT Corporation System, 350 North St. Paul, Dallas, Texas 75201.

12.     Defendant **The Group Life and Health Benefits Plan for Employees of Participating AMR Corporation Subsidiaries** may be served through its agent for service of process, Managing Director, Benefits and Productivity, at its mailing address, Mail Drop 5126-HDQ, P.O. Box 619616, DFW Airport, Texas 75261-9616.

13.     Defendant **American Airlines, Inc.** may be served through its agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

### IV.

### Factual Background

A.  The Plan & The Policy

14.     At all times material herein, up to and including the time of death of Richard Mahoney, Donna Mahoney was an employee of American Airlines.

15.     At all times material herein, Donna Mahoney was covered as an employee under The Group Life and Health Benefits Plan for Employees of Participating AMR Corporation Subsidiaries ("The Plan").

16.     At all times material herein, Plaintiff Donna Mahoney's benefits under The Plan included Accidental Death & Dismemberment Insurance (AD&D) and Voluntary

---

"Cigna" and/or "Cigna Group Insurance" with regard to the events hereinafter described. Plaintiff specifically invokes her right to have the true name of the party substituted at a later time if necessary.

[2] Pursuant to the provisions of Rule 28 of the Texas Rules of Civil Procedure and other applicable law, Plaintiff specifically invokes her right to institute suit against whatever entity was conducting business using the assumed or common name of "Cigna" and/or "Cigna Group Insurance" with regard to the events hereinafter described. Plaintiff specifically invokes her right to have the true name of the party substituted at a later time if necessary.

Personal Accident Insurance (VPAI) Benefits under a group policy issued to the Plaintiff for her husband, Richard Mahoney ("The Policy").

17. Up to the time of death of Richard Mahoney and at all times material herein, Donna Mahoney was a covered person under the terms of the Policy.

18. At all times material herein, up to and including the time of death of Richard Mahoney, Donna Mahoney was married to Richard Mahoney.

19. At the time of his death and at all times material herein, Richard Mahoney was a covered person under the terms of the Policy.

20. The Policy was in full force and effect throughout July of 2014 and at all times material herein, including at the time of the death of Richard Mahoney.

B.  Benefits under The Plan

21. At all times material herein, American Airlines, Inc. was the sponsor of The Plan.

22. At all times material herein, American Airlines, Inc. was the administrator of The Plan.

23. According to The Plan's Summary Plan Description, "The Plan's AD&D and VPAI are provided under group insurance policies issued by the Life Insurance Company of North America (LINA)".

24. According to The Plan's Summary Plan Description, "CIGNA processes all claims for LINA."

25. "Cigna" and "Cigna Group Insurance" are registered service marks and refer to various operating subsidiaries of Cigna Corporation. Products and services are provided by the subsidiaries and not by Cigna Corporation. These subsidiaries include

Life Insurance Company of North America, Cigna Life Insurance Company of New York, and Connecticut General Life Insurance Company.

26.     The Plan does not vest LINA, Cigna, Cigna Group Insurance, Cigna Life Insurance Company of New York or Connecticut General Life Insurance Company with discretion and/or authority to construe terms of The Plan and/or The Policy.

27.     The Plan does not vest LINA, Cigna, Cigna Group Insurance, Cigna Life Insurance Company of New York or Connecticut General Life Insurance Company with discretion and/or authority to make eligibility determinations of claims made under The Plan and/or The Policy.

C.   Richard Mahoney's Death

28.     Richard Mahoney died on or about July 14, 2015.

29.     Richard Mahoney accidentally drowned in his backyard swimming pool.

30.     Collin County Assistant County Medical Examiner, Lynn Salzberger, M.D. investigated Richard Mahoney's death, including conducting an autopsy on Richard Mahoney.

31.     Dr. Salzberger prepared an autopsy report regarding Richard Mahoney, which she signed on August 28, 2014 (herein referred to as "Original Autopsy Report").

32.     Dr. Salzberger concluded that Richard Mahoney's death was caused by drowning.

33.     Dr. Salzberger concluded that Richard Mahoney's death was an accident.

34.     "Drowning" is the only cause of death listed on Richard Mahoney's death certificate.

D.   Coverage

35.     Richard Mahoney's death was "caused by an accident" within the meaning of that phrase in the Policy.

36.     Richard Mahoney's death happened "while [he was] an insured … covered by" the Policy within the meaning of that phrase in the Policy.

37.     Richard Mahoney's death was caused "directly [by drowning] and from no other causes" within the meaning of that phrase in the Policy.

38.     Richard Mahoney's death resulted "in a covered loss" within the meaning of that phrase in the Policy.

39.     Richard Mahoney's death was not "caused by [… ] sickness, disease, or bodily infirmity" within the meaning of that phrase in the Policy.

40.     Richard Mahoney's death was not "caused by [… ] any of the Exclusions listed on page 3" of the Policy within the meaning of that phrase in the Policy.

41.     Plaintiff is entitled to the full death benefit and all other benefits available under the Plan and the Policy as a result of the death of Richard Mahoney.

E.   Plaintiff's Claim for Policy Benefits

42.     After her husband's death, Plaintiff submitted a timely, proper and complete claim for payment of The Policy's benefits.

F.   Defendants' Denial of Plaintiff's Claim for Policy Benefits

43.     Plaintiff's claim for benefits under The Policy was denied.

44.     The decision to deny Plaintiff's claim for benefits under The Policy was made by Cigna" and/or "Cigna Group Insurance"; to wit: Life Insurance Company of North America, Cigna Life Insurance Company of New York, and/or Connecticut General Life Insurance Company.

45.     Plaintiff timely and properly appealed the denial of her claim.

46.     Plaintiff's appeal of the denial of her claim for benefits under The Policy was denied.

47.    The decision to deny Plaintiff's appeal of the denial of her claim for benefits under The Policy was made by Cigna" and/or "Cigna Group Insurance"; to wit: Life Insurance Company of North America, Cigna Life Insurance Company of New York, and/or Connecticut General Life Insurance Company.

48.    Plaintiff timely and properly pursued a second appeal of her claim.

49.    Plaintiff's second appeal was denied by a letter dated September 24, 2015 stating that "all administrative levels of appeal have been exhausted and we cannot honor any further appeals on this claim."

50.    The decision to deny Plaintiff's second appeal of her claim for benefits under The Policy was made by Cigna" and/or "Cigna Group Insurance"; to wit: Life Insurance Company of North America, Cigna Life Insurance Company of New York, and/or Connecticut General Life Insurance Company.

G.  Information in Possession of Defendants at the time of Denial of Plaintiff's Claim

51.    Defendants had in its possession a copy of the Original Autopsy Report at the time of the final denial of Plaintiff's claim for benefits under the Policy.

52.    In the Original Autopsy Report, Dr. Salzberger opined and concluded that Richard Mahoney died as a result of drowning.

53.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicted Dr. Salzberger's opinion that Richard Mahoney died as a result of drowning.

54.    Dr. Salzberger, on May 14, 2015, issued a supplemental report regarding Richard Mahoney (herein referred to as "Supplemental Autopsy Report").

55.     Defendants had in their possession a copy of the Supplemental Autopsy Report at the time of the final denial of Plaintiff's claim for benefits under the Policy.

56.     In the Supplemental Autopsy Report, Dr. Salzberger found no evidence or proof that Richard Mahoney sustained a heart related event prior to or contemporaneous to his death.

57.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicted Dr. Salzberger's determination that there is no evidence or proof that Richard Mahoney sustained a heart related event prior to or contemporaneous to his death.

58.     In the Supplemental Autopsy Report, Dr. Salzberger stated that "to conclude that a natural event actually did precipitate the drowning would be pure speculation".

59.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicted Dr. Salzberger's opinion that "to conclude that a natural event actually did precipitate the drowning would be pure speculation".

60.     In the Supplemental Autopsy Report, Dr. Salzberger stated that she "found no evidence of an acute cardiac event at autopsy".

61.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicted Dr. Salzberger's opinion that there is "no evidence of an acute cardiac event at autopsy".

62.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation of any credible evidence that Richard Mahoney suffered from an acute cardiac event at the time of his death.

63.     In the Supplemental Autopsy Report, Dr. Salzberger stated that Mr. Mahoney's cause of death was drowning.

64.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicted Dr. Salzberger's opinion that Mr. Mahoney's cause of death was drowning.

65.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicted that Mr. Mahoney's cause of death was drowning.

66.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants were not in possession of any opinion of any qualified medical professional who contradicted that Mr. Mahoney's cause of death was drowning.

67.     Defendants' consulting forensic pathologist, J. Scott Denton, M.D. agreed, in writing, that Mr. Mahoney's death was an accident and that he drowned.

68.     Dr. Denton acknowledged and wrote in his report that "[t]he current consensus in forensic pathology is that deaths such as Mr. Mahoney's are best certified as accident [.]"

69.     Neither Dr. Denton nor any other expert opined that Mr. Mahoney died because of some sort of natural event or disease *regardless of the swimming pool*; indeed, neither Dr. Denton nor any other medical expert opined that Mr. Mahoney died from anything other than drowning.

70.     No autopsy was ever conducted on Richard Mahoney other than the autopsy performed by Dr. Salzberger.

71.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which indicated that Richard Mahoney had an autopsy by any person other than Dr. Salzberger.

72.    Dr. Salzberger stated in the autopsy of Richard Mahoney that she found "no evidence of an acute cardiac event at autopsy"; explained that "to conclude that a natural event [i.e., Richard's heart] actually did precipitate the drowning would be pure speculation"; stated that "[]it is not uncommon for adults who know how to swim to drown, especially when alcohol use is involved" and "[o]f note, Mr. Mahoney was intoxicated at the time of his drowning"; and ultimately concluded "[b]ased on the scene, circumstances and autopsy findings, Mr. Mahoney's cause of death is drowning" and "[t]he manner is accident."

73.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradict any opinion, statement or finding of  Dr. Salzberger, as set forth in the Original Autopsy Report and/or the Supplemental Autopsy Report.

74.    Forensic pathologist Edward N. Willey, M.D., investigated Richard Mahoney's death.

75.    Defendants had the June 12, 2015 report of Edward N. Willey, M.D. ("Willey Report") in its possession at the time of its final denial of Plaintiff's claim for benefits.

76.    The Willey Report found that "Mr. Mahoney drowned."

77.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "Mr. Mahoney drowned."

78. The Willey Report found that "Mr. Mahoney's death was an accident."

79. At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "Mr. Mahoney's death was an accident."

80. The Willey Report found that "There is no evidence to support Mr. Mahoney died because of his heart disease."

81. At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that that "[t]here is no evidence to support Mr. Mahoney died because of his heart disease."

82. The Willey Report found that Mr. Mahoney "had consumed potable alcohol".

83. At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that Mr. Mahoney "had consumed potable alcohol".

84. The Willey Report found that Mr. Mahoney's "blood alcohol was 0.118%, sufficiently intoxicating to be disabling to drive a vehicle."

85. At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that Mr. Mahoney's "blood alcohol was 0.118%, sufficiently intoxicating to be disabling to drive a vehicle."

86. The Willey Report found that "alcoholic intoxication and drowning are a frequently observed combination."

87.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "alcoholic intoxication and drowning are a frequently observed combination."

88.     The Willey Report found that "Mr. Mahoney had elected to swim in the dark in a pool which had underwater lights and a waterfall."

89.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "Mr. Mahoney had elected to swim in the dark in a pool which had underwater lights and a waterfall."

90.     The Willey Report found that "[e]ntering water creates weightlessness with sensory deprivation confounded by darkness, underwater lighting, and sounds of waterfall."

91.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[e]ntering water creates weightlessness with sensory deprivation confounded by darkness, underwater lighting, and sounds of waterfall."

92.     The Willey Report found that Mr. Mahoney was in "a hazardous environment."

93.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that Mr. Mahoney was in "a hazardous environment."

94.     The Willey Report found that up to the time of his death, "Mr. Mahoney was functional, living independently."

95.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradict the conclusion set forth in the Willey Report that up to the time of his death, "Mr. Mahoney was functional, living independently."

96.     The Willey Report found that "There is no evidence [Mr. Mahoney] was disabled by his heart disease."

97.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "There is no evidence [Mr. Mahoney] was disabled by his heart disease."

98.     The Willey Report found that "There is no indication [Mr. Mahoney] suffered heart failure, nor adverse cardiac signs or symptoms."

99.     At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "There is no indication [Mr. Mahoney] suffered heart failure, nor adverse cardiac signs or symptoms."

100.    The Willey Report found that "[i]nterrogation of Mr. Mahoney's pacemaker showed no abnormalities from April to the time his demise was assumed."

101.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[i]nterrogation of Mr. Mahoney's pacemaker showed no abnormalities from April to the time his demise was assumed."

102.　The Willey Report found that "Mr. Mahoney survived with his coronary artery disease."

103.　At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "Mr. Mahoney survived with his coronary artery disease."

104.　The Willey Report found that "[i]t is common to find extensive coronary artery disease in autopsied subjects who die from other established causes."

105.　At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[i]t is common to find extensive coronary artery disease in autopsied subjects who die from other established causes."

106.　The Willey Report found "[t]here was no acute change such as coronary artery thrombosis to suggest a cause of death."

107.　At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[t]here was no acute change such as coronary artery thrombosis to suggest a cause of death."

108.　The Willey Report found that "[c]ollateral circulation was sufficient to sustain adequate perfusion to heart muscle."

109.　At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[c]ollateral circulation was sufficient to sustain adequate perfusion to heart muscle."

110. At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which opined that 10:23 pm, July 14. 2014, was the time of Richard Mahoney's death.

111. The Willey Report found that "[s]pontaneous development of cardiac arrhythmia causing drowning is not scientifically distinguishable from drowning causing the same electrocardiographic abnormalities."

112. At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[s]pontaneous development of cardiac arrhythmia causing drowning is not scientifically distinguishable from drowning causing the same electrocardiographic abnormalities."

113. The Willey Report found that "[w]ere Mr. Mahoney to have suffered sudden death while immersed, he would not have had vital activity necessary to inhale water, cause extensive pulmonary edema, foam in his airways, and water in his sphenoid sinus."

114. At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[w]ere Mr. Mahoney to have suffered sudden death while immersed, he would not have had vital activity necessary to inhale water, cause extensive pulmonary edema, foam in his airways, and water in his sphenoid sinus."

115. The Willey Report found that "[i]t is guessing to say Mr. Mahoney died at 10:23 p.m."

116.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[i]t is guessing to say Mr. Mahoney died at 10:23 p.m."

117.    The Willey Report found that "[t]o state [that] Mr. Mahoney actually did become incapacitated by cardiac disease is speculative."

118.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradicts the conclusion set forth in the Willey Report that "[t]o state [that] Mr. Mahoney actually did become incapacitated by cardiac disease is speculative."

119.    The Willey Report found that Mr. Mahoney's "death was an accident."

120.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradict the conclusion set forth in the Willey Report that Mr. Mahoney's "death was an accident."

121.    The Willey Report found that "There is no evidence to support [Mr. Mahoney] died because of his heart disease."

122.    At the time of the final denial of Plaintiff's claim for benefits under the Policy, Defendants possessed no documentation which contradict the conclusion set forth in the Willey Report that "[t]here is no evidence to support [Mr. Mahoney] died because of his heart disease."

**V.**

**Standard of Review**

123.    The standard of review to be applied by this Court in this lawsuit to the decision by

Defendants to deny Plaintiff's claim for benefits under The Policy is *de novo*.

124.    *De novo* is the proper and correct standard of review to apply by this Court for three

(3) separate and independent reasons:  (1) Texas law requires such by statutorily

outlawing and forbidding "discretionary clauses", (2) even if "discretionary clauses"

were permitted by Texas law (which they aren't), The Plan does not expressly confer

discretion on LINA, Cigna, or Cigna Group Insurance and (3) even if Texas law did

allow "discretionary clauses" (which is does not) and even if The Plan did confer

discretion to LINA/Cigna/Cigna Group Insurance (which it does not), LINA, Cigna

and Cigna Group Insurance have a fundamental conflict of interest that significantly

affects the benefits decision at issue herein and, as such, requires *de novo* review.

A.  Any purported "discretionary clauses" are unenforceable.

125.    "Inclusion of a discretionary clause in any form to which [28 TEX. ADMIN. CODE §

3.1201 *et seq*. ("Subchapter M")] applies is prohibited." 28 TEX. ADMIN. CODE §

3.1203.

126.    A prohibited "discretionary clause" is any provision that: (1) purports or acts to bind

the claimant to, or grant deference in subsequent proceedings to, adverse claim

decisions or policy interpretations by the insurer or health maintenance organization;

(2) specifies that a policyholder or other claimant may not contest or appeal a denial

of a claim; (3) specifies that the insurer's or health maintenance organization's

interpretation of the terms of a form or its decision to deny coverage or the amount of

benefits is binding upon a policyholder or other claimant; (4) specifies that in any appeal the insurer's or health maintenance organization's decision-making power as to the interpretation of the terms of a form or as to coverage is binding; or (5) specifies or gives rise to a standard of review in any appeal process that gives deference to the original claim decision or provides standards of interpretation or review that are inconsistent with the laws of Texas. 28 TEX. ADMIN. CODE § 3.1202.

127. "For forms issued or delivered prior to the effective date of [Subchapter M] that do not contain a renewal date," Subpchapter M nonetheless "applies on or after the effective date of any rate increase applicable to the form or any change, modification, or amendment of the form occurring on or after June 1, 2011." 28 TEX. ADMIN. CODE § 3.1201(d).

128. There were rate increases applicable to The Policy occurring after June 1, 2011.

129. There were changes, modifications, and/or amendments to The Policy after June 1, 2011.

130. Subchapter M, 28 TEX. ADMIN. CODE § 3.1201 *et seq.*, applies to Plaintiff's claim for benefits under The Policy.

131.  Any purported discretionary clause in The Policy and/or The Plan is prohibited, does not apply, and is unenforceable.

132. This Court must apply a *de novo* review standard in this lawsuit to the decision by Defendants to deny Plaintiff's claim for benefits under The Policy.

B.  The Plan does not expressly confer discretion on LINA, Cigna, or Cigna Group
Insurance.

133.    Even when "discretionary clauses" are not prohibited, a denial of benefits challenged
under 29 U.S.C. 1132(a)(1) is reviewed under a *de novo* standard unless the denial is
made by one who has been expressly granted discretionary authority by the terms of
the Plan to determine eligibility for benefits or to construe the terms of the plan.

134.    The Plan provides:

LINA's and CIGNA's Roles.

Accident coverage is provided under group insurance policies issued by
the Life Insurance Company of North America (LINA). CIGNA processes
and pays all claims for LINA.

135.    The Plan does not expressly confer discretionary authority on LINA, Cigna or Cigna
Group Insurance authority to construe the terms of the Plan and/or The Policy.

136.    The Plan does not expressly delegate any discretionary authority to determine
eligibility for benefits under The Plan and/or The Policy to LINA, Cigna and/or Cigna
Group Insurance.

137.    The Plan's Administrator has never delegated or vested, in writing, the authority or
discretion for LINA, Cigna and/or Cigna Group Insurance to construe the terms of
The Plan and/or The Policy.

138.    The Plan's Administrator has never delegated or vested, orally, the authority or
discretion for LINA, Cigna and/or Cigna Group Insurance to construe the terms of
The Plan and/or The Policy.

139.    The Plan's Administrator has never delegated or vested, in writing, the authority or discretion for LINA, Cigna and/or Cigna Group Insurance to determine eligibility for benefits under The Plan and/or The Policy.

140.    The Plan's Administrator has never delegated or vested, orally, the authority or discretion for LINA, Cigna and/or Cigna Group Insurance to determine eligibility for benefits under The Plan and/or The Policy.

141.    The Plan delegates to LINA, Cigna and/or Cigna Group Insurance the ministerial tasks of processing and paying claims.

142.    "Processing and paying claims" does not include discretion to construe the terms of The Plan and/or The Policy.

143.    "Processing and paying claims" does not include discretion to determine eligibility for benefits under The Plan and/or The Policy

144.    LINA, Cigna and/or Cigna Group Insurance's determination of eligibility for benefits at issue herein must be reviewed *de novo* because The Plan does not vest LINA, Cigna and/or Cigna Group Insurance with such authority.

C.  LINA/Cigna/Cigna Group Insurance have a fundamental conflict of interest that significantly affects the benefits decision at issue.

145.  The decision by LINA/Cigna/Cigna Group Insurance to award or deny benefits under Plaintiff's claim impacts Defendants' own financial interests.

146.  LINA/Cigna/Cigna Group Insurance have a fundamental conflict of interest in that if they were allowed to determine Plaintiff's claim and LINA/Cigna/Cigna Group Insurance would be responsible for paying the claim; by denying the claim, LINA/Cigna/Cigna Group Insurance profited by the amount of expenses avoided.

147.  Although Defendants misleadingly represent that an entity called Cigna or called Cigna Group Insurance is processing claims for an entity called LINA, in practice LINA, Cigna, and Cigna Group Insurance are one and the same for purposes of the conflict of interest issue in this case.

148.  LINA/Cigna/Cigna Group Insurance have a history of biased claims administration, such as: inconsistent reasons for denials, systematically deemphasizing and failing to credit reliable evidence suggesting a claim is covered, repeated denial of benefits by incorrectly interpreting plan terms, systematically resolving all doubts against coverage, and/or by making decisions against the weight of evidence in the record.

149.  Defendant used and relied on unqualified and/or biased record reviewers.

150.  Upon information and belief, LINA/Cigna/Cigna Group Insurance frequently solicits reports from its internal medical staff (including Dr. R. Norton Hall) and from Dr. J. Scott Denton in attempts to justify predetermined decisions to deny death claims.

151.  Upon information and belief, LINA/Cigna/Cigna Group Insurance solicited reports from Dr. R. Norton Hall and Dr. J. Scott Denton regarding the death of Richard Mahoney in an attempt to justify a predetermined decision to deny Plaintiff's claim.

152.    LINA/Cigna/Cigna Group Insurance's conflict of interest significantly affected the

benefits decision at issue herein.

153.    For these reasons, even assuming an abuse of discretion standard could arguendo be

applied for any reason, LINA/Cigna/Cigna Group Insurance's conflict of interest

requires a *de novo* review.


**V.  Requests for Relief**
**Count One**
**Claim for Benefits**

154.    Plaintiff incorporates the preceding allegations and statements as though set forth

herein.

155.    Plaintiff seeks from Defendants benefits which have not been paid to Plaintiff which

are due and owing to Plaintiff under The Plan and The Policy.

156.    Plaintiff is entitled to the death benefits as a result of the death of her husband

Richard Mahoney.

157.    Plaintiff has complied with all obligations to be entitled to such benefits.

158.    All conditions precedent to the relief sought have occurred or been performed.

159.    Defendant's decision to deny Plaintiff the benefits due under the terms of the Policy

was arbitrary, capricious, not made in good faith, unsupported by substantial

evidence, and erroneous as a matter of law.

160.    Defendants' determination that Mr. Mahoney's death was excluded by the Policy is

legally wrong and, additionally and alternatively, is not supported by substantial

credible evidence.

161.   Defendants' interpretation of the Policy—*i.e.*, that a death caused by an accident (drowning) is excluded if a disease can be said to have somehow contributed to causing the accident—is not only legally wrong but is also arbitrary and capricious.

162.   The Policy excludes "losses caused by a disease [but does not exclude] losses caused by accidents that were caused by a disease." *Ferguson v. United of Omaha Life Ins. Co.*, 3 F.Supp.3d 474 (2014) (holding that where claimant "died of an accidental drowning. Whether the cause of the drowning was a seizure, a slip and fall into a pool, being swept off a boat, or any other cause, is simply not material."); *Kellogg v. Metropolitan Life Insurance Company,* 549 F.3d 818 (10th Cir. 2008); *Pavicich v. Aetna Life Insurance Company*, Civ. No. 09–818, 2010 WL 3854733 (D.Colo. Sept. 27, 2010); *see also, National Life & Accident Insurance Co. v. Franklin*, 506 S.W.2d 765 (Tex.App. 1974) ("If we assume that epilepsy caused the fall, that does not mean it caused his death. […] [E]pilepsy may have caused the accident, *i.e.* the fall, but it did not cause the death by drowning. The fact that death comes about in a way that is not a 'natural and probable consequence' of the hazards of the disease permits the conclusion that it is caused by accidental means."); *Orman v. Prudential Insurance Co.*, 296 N.W.2d 380 (Minn. 1980); *Manufacturers' Accident Indemnity Co. v. Dorgan*, 58 F. 945, 954 (6th Cir.1893).

163.   Defendants' written denials of Plaintiff's claim for benefits all depend on the notion of "contributing" causes of the accident even though no provision in the Policy excludes a death based on a "contributing" cause of the accident that causes a death. Rather, the exclusionary language in the Policy is substantively identical to the type that has been described by the Fifth Circuit as the "first type" of exclusion; *i.e.*, the

type that does **not** exclude a death merely because it was caused by an accident that was, in turn, perhaps caused by a disease. *See, Sekel v. Aetna Life Ins. Co*., 704 F.2d 1335, 1337 (5th Cir. 1983) discussing *Stroburg v. Insurance Company of North America*, 464 S.W.2d 827, 829-31 (Tex. 1971) (holding that claim under similar policy as that herein <u>was covered</u> because the claimant's death was caused by injuries in a car accident regardless of whether "a pre-existing bleeding ulcer induced fainting or weakness to cause the accident").[3]

164.    LINA/Cigna/Cigna Group Insurance's interpretation of the policy must be reviewed *de novo* and is legally wrong, and Plaintiff is entitled to the death benefit under the Policy.

165.    Alternatively, even assuming the interpretation of the policy is reviewed for an abuse of discretion, LINA/Cigna/Cigna Group Insurance abused any such discretion because the interpretation at issue is unreasonable, contrary to the plain language of the Policy, goes against well-established precedent construing the very same sort of language, and is arbitrary and capricious.

166.    In any event, even assuming LINA/Cigna/Cigna Group Insurance's interpretation of the policy was correct and/or does not itself constitute an itself an abuse of discretion, Plaintiff is still entitled to the death benefit under the Policy because there is not substantial evidence to support the denial of Plaintiff's claim; *i.e.* there is not

---

[3] *See also, gen., Brandon v. Travelers Insurance Company,* 18 F.3d 1321, 1326 (5th Cir.1994), cert. denied, 513 U.S. 1081 (1995) (when looking to federal common law, where such law is "not clear, [the courts] may draw guidance from analogous state law." (quoting *McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir.1990)); accord *Manning v. Hayes,* 212 F.3d 866, 872 (5th Cir. 2000) (federal courts "borrow from state law when determining the federal common law that should control such claims").

substantial evidence to support LINA/Cigna/Cigna Group Insurance's determination

that "Richard Mahoney's death was caused by or contributed to by his sickness,

disease or bodily infirmity."

167.   Plaintiff requests that the Court award Plaintiff benefits which have not been paid.

168.   Plaintiff requests that, by appropriate order, the Plan, American Airlines, Inc. (the

Plan's sponsor and administrator), and LINA/Cigna/Cigna Group Insurance (who

issued the Policy and processed the claim) be ordered to pay all benefits owed to

Plaintiff under the Policy and Plan as a result of the death of Richard Mahoney.

**Count Two**
**Attorney's Fees**

147.   Plaintiff incorporates the preceding allegations as though set forth herein.

148.   Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff seeks an award of Plaintiff's reasonable and

necessary court costs, and attorney's fees in connection with the prosecution of this action.

**PRAYER**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     For a declaration regarding the Defendants' noncompliance with minimum
       requirements of ERISA and other federal and state laws in connection with the
       denial of benefits;

B.     For benefits payable under the Policy and Plan to Plaintiff;

C.     For an award of prejudgment interest;

D.     For an award of reasonable attorney's fees pursuant to 29 U.S.C.A. § 1132(g)(1);

E.     For costs incurred;

F.     For such other and further relief as the Court deems appropriate.

DATE:  November 17, 2015.


Respectfully submitted,


*s/ Michael E. Heygood*
MICHAEL E. HEYGOOD
State Bar No. 00784267
michael@hop-law.com
JAMES CRAIG ORR, JR.
State Bar No. 15313550
jim@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161, Suite 450
Irving, Texas 75038
(214) 237-9001
(214) 237-9002 (fax)

**ATTORNEYS FOR PLAINTIFF**